UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

------------------------------------------------------

REBEKA STOWELL and ALLISON FUNK,

           Plaintiffs,

       v.

THE BOARD OF REGENTS OF THE
UNIVERSITY OF HOUSTON SYSTEM; and
RENU KHATOR, sued in her official capacity as
Chancellor of the University of Houston System
and President of the University of Houston,

           Defendants.

------------------------------------------------------

**COMPLAINT**

**CIVIL ACTION**

**NO.** _____

## <u>COMPLAINT</u>

Plaintiffs, REBEKA STOWELL and ALLISON FUNK, individuals, by and through their undersigned counsel, hereby file this Complaint and sue THE BOARD OF REGENTS OF THE UNIVERSITY OF HOUSTON SYSTEM, as the political entity responsible for the University of Houston, for damages, injunctive and declaratory relief, attorneys' fees and costs, pursuant to Section 504 of the Rehabilitation Act of 1973, <u>29 U.S.C. § 794</u> *et seq*. ("Rehabilitation Act" or "RA"); injunctive and declaratory relief, attorneys' fees and costs pursuant to Title II of the Americans with Disabilities Act, <u>42 U.S.C. § 12131</u> *et seq*. ("Americans with Disabilities Act" or "ADA"); and sue RENU KHATOR, in her official capacity as Chancellor of the University of Houston System and President of the University of Houston, for injunctive and declaratory relief and attorneys' fees and costs, pursuant to the ADA and the Rehabilitation Act. THE BOARD OF

REGENTS OF THE UNIVERSITY OF HOUSTON SYSTEM and RENU KHATOR are collectively referred to herein as "DEFENDANTS."

## **JURISDICTION AND PARTIES**

1.    This is an action for declaratory and injunctive relief pursuant to Title II of the Americans with Disabilities Act, 42 U.S.C. §12131 *et seq*., and damages, declaratory and injunctive relief pursuant to Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq*. This Court is vested with original jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

2.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the Property that is the subject of this action is located in the Southern District of Texas, City of Houston.

3.    Plaintiff REBEKA STOWELL presently resides in Houston, Texas.

4.    MS. STOWELL is a qualified individual with a disability under the ADA. MS. STOWELL has Postural Orthostatic Tachycardia Syndrome ("POTS"). Due to her disability, Rebeka is substantially impaired in several major life activities, including walking and standing, and relies on a power wheelchair for mobility.

5.    MS. STOWELL also has Type 1 Diabetes. Under the regulations for Title II of the ADA, diabetes is a physical impairment. *See* 28 C.F.R. § 35.108(b)(2). Moreover, under the regulations for Title II of the ADA, there are certain "predictable assessments," that is, physical impairments that predictably make an individual a qualified individual with a disability. One of these predictable assessments is that "Diabetes substantially limits endocrine function[.]" *See* 28 C.F.R. § 35.108(d)(2)(H).

6.    Plaintiff ALLISON FUNK presently resides in Houston, Texas.

2

7.     MS. FUNK is a qualified individual with a disability under the ADA. MS. FUNK has Congenital Hypomyelinating Neuropathy and she requires a power wheelchair for mobility. Specifically, MS. FUNK is unable to walk, lift more than five pounds, or stand without assistance.

8.     PLAINTIFFS are students at the University of Houston.

9.     Upon information and belief, defendant THE BOARD OF REGENTS OF THE UNIVERSITY OF HOUSTON SYSTEM (hereinafter referred to as the "BOARD") is the political entity responsible for owning, administering, operating, and/or maintaining the University of Houston.

10.    Upon information and belief, Defendant RENU KHATOR (hereinafter referred to as "KHATOR") is the Chancellor of the University of Houston System and President of the University of Houston and is responsible for the functioning and control of all of the programs and services offered by the BOARD. Defendant KHATOR is sued in her official capacity for declaratory and injunctive and attorneys' fees/costs under the ADA and the Rehabilitation Act, pursuant to the doctrine of *Ex parte Young*.

11.    Upon information and belief, the BOARD is the owner and/or operator of the services, property, improvements, accommodations, and programs which are the subject of this action, to wit: University of Houston, which is located in downtown Houston over a multiple acre campus (hereinafter sometimes referred to as "UH" or the "Property").

12.    DEFENDANTS are responsible for complying with the obligations of the ADA and the Rehabilitation Act.

## BACKGROUND

13.    MS. STOWELL enrolled at UH in the fall of 2022. She is a retail and consumer science major.

14.    MS. FUNK enrolled at UH in the fall of 2018 and is part of the playwriting program.

15.    Both MS. FUNK and MS. STOWELL presently reside on campus at UH in the Cougar Place student dormitory. However, as described below, PLAINTIFFS have encountered barriers at Cougar Place that have caused them serious difficulty, and even bodily injury, while trying to enter and exit the building.

### Ms. Funk Breaks Her Arm While Trying to Exit Her Dorm Room Because UH Initially Refuses to Install an Automatic Door Opener.

16.    MS. FUNK moved into Cougar Place during her freshman year at UH in August 2018. MS. FUNK has a neuromuscular disease that causes weakness in her arm and leg muscles, which makes it difficult to lift more than five pounds. MS. FUNK uses a power wheelchair for mobility.

17.    MS. FUNK experienced difficulty entering and exiting her dorm room because it was hard for her to open the door and maneuver her power wheelchair through the door. MS. FUNK contacted disability services and the office of student housing shortly after she moved in to request accommodations so that she could enter and exit her dorm room.

18.    MS. FUNK exchanged emails with Kenny Mauk, the Director of Housing Operations and Outreach, and requested that an automatic door be installed for her room. Mr. Mauk told MS. FUNK that this modification was not available because of its "significant cost."

19.    Instead, MS. FUNK was advised to ask the desk assistants at Cougar Place to open the

door for her. This solution worked most of the time when MS. FUNK was trying to enter her room, but desk assistants were confused about how to assist her when she wanted to exit her room.

20.     Exasperated with the lack of progress with Mr. Mauk, MS. FUNK contacted the office of the President, KHATOR. Don Yackley, the Executive Director of Student Housing and Residential Life responded on behalf of KHATOR.

21.     Mr. Yackley and MS. FUNK corresponded back and forth about how to accommodate her so she could enter and exit her room without assistance. After nearly a month, Mr. Yackley offered to have a door that could be automatically opened from the inside installed despite the fact that this option had previously been deemed "too expensive."

22.     However, before the automatic door could be installed, MS. FUNK was injured while trying to open the door to her room.

23.     On or around the first week of October 2019, MS. FUNK was trying to exit her dorm room and her arm got trapped in the door causing her arm to break.

24.     Finally, approximately a month after MS. FUNK broke her arm, an automatic door was installed for her room.

25.     MS. FUNK detailed her ordeal through a series of posts on Twitter that went "viral" and were shared among other students at UH.

26.     Following MS. FUNK'S publicization of her struggles trying to get an automatic door for her room, upon information and belief, UH changed its policy and agreed to install four new automatic doors in housing units at UH.

27.     MS. FUNK'S ordeal with trying to get an automatic door installed for her dorm room is

not the subject of this action, however, its illustrative of DEFENDANTS' approach to accessibility at UH.



**Plaintiffs Have Experienced Great Difficulty Entering Cougar Place**
**Because the Automatic Door Opener is Consistently Broken**

28.     MS. FUNK moved into Cougar Place student housing in August 2018. MS. FUNK still resides in a dorm room on the first floor.

29.     MS. FUNK had encountered issues with the external automatic door opener not working during the spring 2022 semester.

30.     MS. FUNK was frustrated that the automatic front doors at Cougar Place were consistently broken and her requests for repair were being ignored. MS. FUNK tweeted about her experience to UH, hopeful that she would get a response and the doors would be fixed.



31.     No one from UH responded to MS. FUNK'S tweet and the doors were not fixed until after the semester ended.

32.     MS. STOWELL moved into Cougar Place student housing on August 19, 2022. Upon arrival at Cougar Place, MS. STOWELL immediately realized that the automatic opener for the external door to enter the building was not working.

33.     PLAINTIFFS cannot independently open the external door to Cougar Place student housing. The door is too heavy, and PLAINTIFFS are unable to maneuver around the door to open it because of their power wheelchairs.

34.     When the external door opener is not working, PLAINTIFFS must rely on people passing by to help them open the door or calling the front desk of Cougar Place to get assistance from the person working at the front desk. However, the phone at the front desk is not always working.

35.     On August 19, 2022, when she realized that that automatic front door opener was not working, MS. STOWELL filed a request to repair the door opener (called a "FIXIT"). On August 22, 2022, the external automatic door opener was repaired.

36.     Just over a week later, on September 1, 2022, the external automatic door opener again stopped working. MS. STOWELL filed a FIXIT request on September 1, 2022. Thereafter, MS. STOWELL filed several additional FIXIT requests to no avail. MS. STOWELL was concerned that her FIXIT requests were not going through because she would not receive any confirmation or reference number for her request.

37.     On September 14, 2022, after two weeks of being unable to independently enter her dorm building, MS. STOWELL emailed the FIXIT service and the Director and Assistant Director of the Student Accessibility Center. MS. STOWELL did not receive a response to her email.

38.     On September 20, 2022, MS. STOWELL was trying to enter Cougar Place and needed to access her room quickly due to a health issue. The automatic door opener was still broken, and MS. STOWELL had to wait for a resident leaving the building to open the door. MS. STOWELL was frustrated, humiliated, and feared for her health and safety because she was unable to quickly enter her dorm.

39.     Finally, on September 21, 2022, Michael Oestereicher, the Assistant Vice President of

8

Facilities Services, responded to MS. STOWELL'S email, stating that they would "look into this and contact you today with a way forward."

40.     MS. STOWELL also received an email from Ericka Berenz, the Residential Life Coordinator for Cougar Place, that MS. STOWELL could reach out to her directly if she had any issues or concerns and that "Lockshop is repairing the mistake now…"

41.     The automatic external door opener was finally repaired on September 21, 2022, but not for long.

42.     On September 26, 2022, the automatic external door opener stopped working again. Approximately a week later, the door was fixed.

43.     Just a few weeks later, on October 20, 2022, the automatic external door opener stopped working. MS. STOWELL emailed Kyle Mutz, Director of the of the Student Accessibility Center, informing him that the opener was not working and asking for someone to come and fix it.

44.     Over the next two weeks, MS. STOWELL and Mr. Mutz traded emails back and forth about the malfunctioning door opener. Mr. Mutz acknowledged that "this has been an issue and we will work hard to improve this." However, the automatic external door opener was still not repaired.

45.     On November 2, 2022, Carrie Stowell, MS. STOWELL'S mother, emailed David Oliver, the Sr. Associated Vice Chancellor/Vice President of UH. Carrie Stowell detailed MS. STOWELL'S ordeals with the broken front door opener. Mr. Oliver responded on November 3, 2022 and stated that the cause of the malfunction was investigated and that the door opener should be repaired that day.

46.     On or around November 5, staff at UH gave MS. STOWELL a proxy card that she could use to tap on a card reader and open the external doors to Cougar Place automatically.

47.     However, as of the date of this filing, the push button for the external automatic door opener for Cougar Place is still broken.

48.     Given the history of malfunction detailed above and DEFENDANTS' failure to quickly respond to requests for repair, it is likely that PLAINTIFFS will again have to deal with a broken external automatic door opener at Cougar Place.

49.     Because of this inaccessibility, PLAINTIFFS are severely limited in their ability to enter the building where they reside.

50.     Additionally, MS. STOWELL has encountered barriers when trying to access the laundry room in Cougar Place. The laundry room is located on the second floor of an adjacent building and MS. STOWELL has to pass through two sets of heavy doors.

51.     MS. STOWELL complained to Mr. Mutz about the barriers to accessing the laundry room on October 25, 2022. However, at the time of this filing, no steps have been taken to remedy the barriers to access to the laundry room at Cougar Place.

**Architectural Barriers Across the UH Campus**

52.     Students at UH receive their mail and packages at the Copy, Print, and Delivery Services Office ("Delivery Services Office") on campus. However, there four steps up into the building where the Delivery Services Office is located and no accessible entrance.

53.     On September 22, 2022, MS. FUNK attempted to retrieve a package that had been delivered to her. She went to the Delivery Services Office to get her package and realized that she could not enter the building because there was no accessible entrance.

54.  MS. FUNK called the Delivery Services Office while waiting outside the building on hold for 20 minutes. Finally, someone at the Delivery Services Office informed MS. FUNK that would need to email the Delivery Services Office to inform them that she uses a wheelchair to have the package delivered to her dorm because the building is inaccessible.

55.  MS. FUNK documented her experience on Twitter and mentioned UH's Twitter handle to inform them of the barrier to access she had encountered at the Delivery Services Office.



56.  No one from UH responded to MS. FUNK'S tweet. MS. FUNK spoke with the

employees at the Delivery Services Office about her inability to access the office and the employees acknowledged that the lack of accessible entrance was a problem. The employees told MS. FUNK that they had voiced their concerns about the lack of accessible entrance to the Delivery Services Office, but that no one from the administrative office had taken any steps to make the office accessible.

57.   MS. STOWELL is aware that the Delivery Services Offices is inaccessible and has items delivered to her mother's address off campus so she can avoid the inaccessible office and discriminatory delivery policy.

58.   Because of this inaccessibility, PLAINTIFFS are limited in their ability to reliably receive packages delivered to them on campus.

59.   In addition to the Delivery Services Office, the Property is littered with architectural barriers to access. Some of these barriers include:

A.   Designated accessible parking spaces that do not contain vertical signage;

B.   Designated accessible parking spaces that lack an accessible route;

C.   Designated accessible parking spaces that contain impermissible slopes;

D.   Curb ramps that contain inaccessible slopes and lack side flares;

E.   Access aisles that are impermissibly narrow;

F.   Doorhandles that require a twisting and/or grasping motion;

G.   Lack of accessible routes to the entrances of buildings;

H.   The landing in front of the front entrance of the Science and Research Building 1 does not have sufficient clear floor space for a person using a wheelchair to open the door and maneuver inside;

I. The automatic door opener of the Science and Research Building 1 is regularly broken and not functioning;

J. The automatic door opener of the Cynthia Woods Mitchell Center for the Arts building is regaularly broken and not functioning. Further, the automatic door opener is inoperable afterhours which is when the rehearsals and shows occur.

K. The tabletop napkin dispensers at the UH dining facilities were replaced with automatic napkin dispensers that are too far from the edge of the counter for a person using a wheelchair to reach;

L. There are accessible routes throughout the campus that contain cracks, impermissible changes in level and impermissible cross-slopes;

M. There are curb cuts throughout the campus that contain cracks, impermissible changes in level, impermissible slopes and cross slopes, and the buildup of dirt and other debris;

N. There are crosswalks and sidewalks throughout the campus that are made of cobblestone and/or brick. These crosswalks contain cracks, impermissible changes in level, dirt and other debris, and impermissible slopes and cross slopes; and

O. Other mobility-related ADA barriers to be identified following a complete inspection of the Property.

**The Starship Autonomous Food Delivery Robots Block Accessible Routes on Campus**

60. In November 2019, UH deployed a fleet of 30 "Starship" autonomous food delivery

robots on its campus.[1] These robots travel through UH's campus and deliver food from its various dining locations to UH students, faculty, and staff.

61.    The Starship robots travel on sidewalks and can cross streets, climb curbs, and navigate around obstacles.[2]

62.    However, PLAINTIFFS have regularly encountered Starship robots blocking the accessible routes at the Property.

63.    MS. FUNK has encountered Starship robots blocking curb cuts and sidewalks, blocking her ability to travel around UH's campus.

64.    The Starship robots have even caused MS. FUNK to be stuck in the street because a robot was blocking the curb cut and was too large for her to maneuver around in her wheelchair.

65.    MS. STOWELL has also encountered the Starship robots on campus. On several occasions, MS. STOWELL'S path has been blocked by the robots and she has been forced to travel in the street because she cannot access the sidewalk.

66.    MS. STOWELL has been unable to travel on a sidewalk on several occasions when more than one Starship robot has blocked the sidewalk and she is unable to pass them with her wheelchair.

---

[1] *See* https://www.uh.edu/news-events/stories/2019/november-2019/11102019-starship-robots.php (last visited November 14, 2022).

[2] *Id.*

67.   On several occasions, the accessible route to MS. STOWELL'S dorm has been blocked by Starship robots.

68.   On February 10, 2022, MS. FUNK tweeted about her encounters with the Starship robots and how they create barriers in the accessible routes on campus. MS. FUNK mentioned UH's twitter handle but received no response from UH regarding these barriers she encountered.



69.   Because of this inaccessibility, PLAINTIFFS are severely limited in their ability to travel around the accessible routes at the Property.

### The Fire Safety Evacuation Plan Does Not Provide Procedures
### For Students with Mobility Disabilities

70.     UH issues an annual security and fire safety report that contains emergency response and

        evacuation procedures.

71.     Due to her disability, MS. FUNK requires assistance getting in and out of bed.

72.     MS. FUNK was concerned for her safety in the event of an emergency, such as a fire, so

        she contacted Kandace Kendall, the Residence Life Coordinator for Cougar Place in

        September 2021. Ms. Kendall explained that MS. FUNK should call the University of

        Houston Police Department ("UHPD") or 911 and report her location and the type of

        assistance she needs.

73.     On or around November 13, 2018, a fire alarm went off in Cougar Place when

        MS. FUNK was in bed. She called UHPD as instructed to seek assistance evacuating the

        building. The person assisting MS. FUNK over the phone was condescending and could

        not understand why MS. FUNK needed assistance evacuating since she lived on the first

        floor.

74.     MS. FUNK explained that she needed assistance getting out of her bed. Instead of

        sending assistance, the UHPD operator hung up on MS. FUNK and instructed

        MS. FUNK'S resident advisor to assure MS. FUNK that the fire alarm was from a

        microwave fire and that she "didn't need to panic."

75.     Troubled and upset by UHPD's attitude towards providing assistance during a fire alarm,

        MS. FUNK reviewed the 2022 Annual Security and Fire Safety Report and noticed that it

        does not include procedures for assisting students with mobility disabilities in the event

of an emergency.

76.     Based on her interactions with UHPD during a fire alarm in her dorm and the lack of written policies for assisting students with disabilities during an emergency, MS. FUNK fears for her safety.

77.     When MS. STOWELL moved into Cougar Place in Fall 2022, she contacted Ericka Berenz, the Residential Life Coordinator for Cougar Place, to ask about safety protocols in the event she needed to evacuate her dorm room. Ms. Berenz told MS. STOWELL that she would reach out to her with this information but has to date failed to provide MS. STOWELL with this vital information.

78.     Because of the lack of effective procedures and/or protocols to assist students with disabilities during emergency situations, PLAINTIFFS are severely limited in their ability to obtain assistance in the event of an emergency while on campus.

## COUNT I
## VIOLATION OF TITLE II OF THE ADA

79.     PLAINTIFFS reallege and reaver paragraphs 1-78 as if they were expressly restated herein.

80.     Upon information and belief, the BOARD is a public entity, subject to the ADA, which owns and administers the Property.

81.     The Property is a university of higher education. The Property is also a centerpiece of the broader Houston community.

82.     Upon information and belief, the BOARD develops and provides the various services and programs offered at the Property. The services and programs at issue in this case include,

but are not limited to: student housing, transportation (including walkways, roads, and parking facilities); dining; shopping; meetings; assemblies; special events; trainings; research (including libraries); and other educational and recreational programs and services.

83. PLAINTIFFS have been to the Property many times in the past. PLAINTIFFS are currently students at UH and reside in on-campus student housing.

84. PLAINTIFFS currently reside in the Cougar Place student dormitory. PLAINTIFFS also often use the Property for programs and activities related to their enrollment as students, such as staying in the student dormitories, attending classes, going to the library, traveling the campus, sporting events, eating, and shopping for food and other goods and services.

85. Specifically, PLAINTIFFS use the Property to reside, attend classes, study, socialize with friends, attend sporting events, and eat.

86. Many of the reasons PLAINTIFFS would go to the Property are for reasons that will extend even beyond their eventual graduation: using the library, attending sporting events, and utilizing the sidewalks, curb cuts, and buildings on campus to attend events, dine at restaurants, and shop at on-campus stores.

87. While at the Property, PLAINTIFFS have encountered numerous architectural barriers while attempting to navigate the Property with their wheelchairs.

88. While at the Property, PLAINTIFFS have had difficulty accessing certain areas as a result of the lack of accessible housing, the lack of accessible routes, and the lack of compliant curb cuts and curb ramps, among other barriers.

89.    While at the Property, PLAINTIFFS have experienced serious difficulty utilizing the services and programs offered at the Property due to the architectural barriers discussed herein.

90.    PLAINTIFFS encountered many of the architectural barriers described herein within the two years preceding the filing of this Complaint.

91.    Upon information and belief, some of the barriers at the Property were newly constructed and/or altered within the two years preceding the filing of this Complaint.

92.    PLAINTIFFS plan to and will return to the Property in the near future to utilize the programs and activities administered at the Property.

93.    PLAINTIFFS fear that they will continue to experience serious difficulty at the Property due to the barriers discussed in Paragraph 97, which still exist.

94.    The barriers discussed below are excluding PLAINTIFFS from the programs and activities offered at the Property and/or making it more difficult/unsafe for PLAINTFFS to use the program and activities at the Property.

95.    The barriers discussed below are depriving PLAINTIFFS of the equal opportunity to participate in, benefit from, or utilize the programs and activities offered at the Property.

96.    Upon information and belief, DEFENDANTS have discriminated against PLAINTIFFS, and continue to discriminate against PLAINTIFFS, in violation of the ADA/Rehabilitation Act, *inter alia* by excluding and/or denying PLAINTIFFS the benefits of its services, programs, and/or activities; by failing to ensure accessible facilities within five (5) years of January 26, 1992; by failing to ensure that all portions of the Property that were constructed or altered after January 26, 1992 were made readily

19

accessible and usable by individuals with disabilities to the maximum extent practicable; and/or by failing to maintain the accessible features at the Property in operable working condition.

97. PLAINTIFFS' visits to the Property show that the program, when viewed in its entirety, is not accessible to people with mobility-related disabilities. The physical barriers to access at the Property include, but are not limited to:

a) The automatic external door opener for Cougar Place student housing is constantly broken and PLAINTIFFS are regularly unable to enter their place of residence without assistance.

b) The route to the laundry room in Cougar Place contains two sets of heavy doors without automatic door openers. PLAINTIFFS are unable to travel to the laundry room without assistance.

c) The Copy, Print, and Delivery Office is located in a building with steps and no accessible entrance.

d) The Starship food delivery robots are constantly traveling through the sidewalks and curb cuts on campus, blocking the accessible route for students who use wheelchairs.

e) The landing in front of the front entrance of the Science and Research Building 1 does not have sufficient clear floor space for a person using a wheelchair to open the door and maneuver inside.

f) The automatic door opener of the Science and Research Building 2 is regularly broken and not functioning.

g)      The automatic The automatic door opener of the Cynthia Woods Mitchell Center for the Arts building is regaularly broken and not functioning. Further, the automatic door opener is inoperable afterhours which is when the rehearsals and shows occur.

h)      The tabletop napkin dispensers at the UH dining facilities were replaced with automatic napkin dispensers that are too far back from the edge of the counter for a person using a wheelchair to reach.

i)      There are designated-accessible parking spaces that fail to have vertical signage and access aisles and contain impermissible slopes.

j)      There are accessible routes throughout the campus that contain cracks, impermissible changes in level and impermissible cross-slopes.

k)      There are curb cuts throughout the campus that contain cracks, impermissible changes in level, impermissible slopes and cross slopes, and the buildup of dirt and other debris.

l)      There are crosswalks and sidewalks throughout the campus that are made of cobblestone and/or brick. These crosswalks contain cracks, impermissible changes in level, dirt and other debris, and impermissible slopes and cross slopes.

m)     Other mobility-related barriers and violations of the Americans with Disabilities Act that may be identified by PLAINTIFFS' expert during a complete inspection of the Property, which will be detailed in an expert report to be provided in accordance with the Scheduling Order.

21

98.    In addition to the existence of the above and other physical barriers, PLAINTIFFS have identified that DEFENDANTS have failed to remedy numerous policy/practices that discriminate against individuals who use wheelchairs. These policies include:

    a)    DEFENDANTS have failed to provide adequate safety protocols to assist students with disabilities in the event of an emergency.

    b)    Students who use wheelchairs for mobility are unable to reliably collect their packages from the Copy, Print, Delivery Services office because it is located in a building without an accessible entrance. Instead, students who use wheelchairs must contact the office and wait for someone to deliver it to them.

99.    DEFENDANTS have discriminated against PLAINTIFFS, and continue to discriminate against them, in violation of Title II of the ADA and its implementing regulations, 28 C.F.R. Part 35.101-35.190 *et. seq.*[3]

100.    DEFENDANTS have discriminated against PLAINTIFFS, and continue to discriminate against them, *inter alia* by denying them full access to the services, programs, and/or activities offered at the Property and/or making it more difficult/unsafe for PLAINTIFFS to use the programs and activities at the Property.

101.    DEFENDANTS have discriminated against PLAINTIFFS, and continue to discriminate against them, *inter alia* by failing to make its facilities readily accessible to people with

---

[3] PLAINTIFFS are not alleging that KHATOR personally committed discrimination against PLAINTFFS. Instead, PLAINTIFFS allege that KHATOR is responsible for the discriminatory acts they have suffered at the Property due to KHATOR'S role as Chancellor and President, and her ability to enforce changes in policies/procedures at the Property.

mobility-related disabilities.

102.    DEFENDANTS have discriminated against PLAINTIFFS, and continue to discriminate against them, *inter alia* by failing to maintain the accessible features at the Property.

103.    DEFENDANTS have discriminated against PLAINTIFF, and continue to discriminate against them, *inter alia* by excluding and/or denying PLAINTIFFS the full and equal benefits of its services, programs, and/or activities, and/or making it more difficult/unsafe for PLAINTIFFS to use the programs and activities at the Property.

104.    DEFENDANTS have discriminated against PLAINTIFFS, and continue to discriminate them, *inter alia* by failing to ensure that all portions of the Property that were constructed or altered after January 26, 1992 were made readily accessible and usable by individuals with disabilities to the maximum extent practicable, Upon information and belief, some of the architectural barriers discussed above in Paragraph 94 are located in parts of the Property which were newly constructed and/or altered after January 26, 1992, and are therefore subject to the heightened standards of 28 C.F.R. Part 35.151.

105.    PLAINTIFFS have personally experienced numerous barriers to access at the Property, as discussed herein.

106.    PLAINTIFFS have been damaged and will continue to be damaged by DEFENDANTS' discrimination as more fully set forth above.

107.    DEFENDANTS' discrimination described herein has resulted in a cognizable injury to PLAINTIFFS. As a direct and proximate result of DEFENDANTS' unlawful discrimination, PLAINTIFFS have suffered frustration, inconvenience, anxiety, humiliation, exclusion, isolation, and an invasion of their civil rights.

108. DEFENDANTS had actual and/or constructive knowledge that mobility-related accessibility issues exist at the Property.

109. DEFENDANTS' policies and practices have a discriminatory impact on people with nobility-related disabilities.

110. DEFENDANTS' policies and practices have a disparate impact on people with mobility-related disabilities.

111. The harms suffered by PLAINTIFFS were the foreseeable result of DEFENDANTS' actions and inactions constituting discrimination.

112. The harms suffered by PLAINTIFFS were the foreseeable result of DEFENDANTS' neglecting their affirmative duty to ensure that the programs and activities offered at the Property are fully accessible to wheelchair users.

113. Based on the facts alleged above, the BOARD, through its employees, intentionally discriminated against PLAINTIFFS.

114. Further, the BOARD, through its employees, was purposeful in its choices, which is sufficient to constitute intentional discrimination under the ADA.

115. 42 U.S.C. § 12133 provides: "[t]he remedies, procedures, and rights set forth in section 794 of Title 29 shall be the remedies, procedures, and rights this subchapter provides to any person alleging discrimination on the basis of disability in violation of section 12132 of this title."

116. The barriers alleged in Paragraph 94 are representative of the mobility-related barriers which are widespread throughout the Property. PLAINTIFFS' expert will conduct a complete inspection to catalog and demonstrate all of the inaccessible features at the

Property. PLAINTIFFS demand an injunction ordering DEFENDANTS to bring the Property into compliance with the ADA

117.    28 C.F.R. § 35.130(4) states that "[a] public entity may not, in determining the site or location of a facility, make selections–(I) [t]hat have the effect of excluding individuals with disabilities from, denying them the benefits of, or otherwise subjecting them to discrimination . . . ."   DEFENDANTS have violated this provision by providing its services, programs, and/or activities at an inaccessible facility.

118.    DEFENDANTS have discriminated against PLAINTIFFS by excluding them from participation in, and denying them the benefits of, the services, programs, and/or activities at the Property, on account of PLAINTIFFS' disabilities, all in violation of 42 U.S.C. § 12132.

119.    Upon information and belief, DEFENDANTS continue to discriminate against PLAINTIFFS, and all those similarly situated, by failing to make reasonable modifications in policies, practices or procedures, when such modifications are necessary to afford all offered goods, services, programs, activities, facilities, privileges, advantages or  accommodations to individuals with disabilities; and by failing to make such efforts that may be necessary to ensure that no individual with a disability is excluded, denied services, programs, and/or activities, segregated, or otherwise treated differently from other individuals because of the absence of auxiliary aids and services.

120.    Upon information and belief PLAINTIFFS and all other individuals similarly situated have been denied access to, and have been denied the benefits of, services, programs and/or activities offered by DEFENDANTS at the Property, and have otherwise been

discriminated against and damaged by DEFENDANTS, because of DEFENDANTS' discrimination, as set forth above.

121.   PLAINTIFFS and all others similarly situated will continue to suffer such discrimination, injury, and damage without the immediate relief provided by the ADA and Rehabilitation Act requested herein. Furthermore, as required by the ADA, Rehabilitation Act, and other remedial civil rights legislation, to properly remedy DEFENDANTS' discriminatory violations and avoid piecemeal litigation, PLAINTIFF demands and injunction ordering DEFENDANTS to bring all areas of the Property into compliance with the ADA.

122.   PLAINTIFFS have retained the undersigned counsel and is entitled to recover reasonable attorneys' fees, costs and litigation expenses from DEFENDANTS, pursuant to 42 U.S.C. § 12205 and 28 C.F.R. § 35.175.

123.   PLAINTIFFS are without adequate remedy at law and are suffering irreparable harm.

124.   Pursuant to 42 U.S.C. § 12131, *et seq*., this Court is provided authority to grant PLAINTIFFS injunctive relief, including an order for DEFENDANTS to alter the Property to make those facilities, and/or programs, and/or activities, readily accessible and useable to PLAINTIFFS and all other persons with disabilities as defined by the ADA; or by closing the Property until such time as DEFENDANTS cure their violations of the ADA.

## COUNT II
## VIOLATION OF THE REHABILITATION ACT

125.   PLAINTIFFS adopt and re-allege the allegations contained in paragraphs 1-124 as if fully stated herein.

26

126.    PLAINTIFFS bring this claim against DEFENDANTS, based upon Section 504 of the

Rehabilitation Act, 29 U.S.C. §794, *et seq*.

127.    The Rehabilitation Act provides that:

> No otherwise qualified individual with handicaps in the United States, as defined
> by 7(8) [29 USCS § 706(8)], shall, solely by reason of his or her handicap, be
> excluded from the participation in, be denied the benefits of, or be subjected to
> discrimination under any program or activity receiving Federal financial
> assistance or under any program or activity conducted by any Executive agency or
> by the United States Postal Service.  29 U.S.C. § 794(a).

128.    Upon information and belief, as set forth herein, DEFENDANTS have violated the

Rehabilitation Act by intentionally excluding and/or making it more difficult/unsafe for

PLAINTIFFS, solely by reason of their disability, from the participation in, and denying

them the benefits of, and have otherwise subjected them to discrimination under

DEFENDANTS' programs and activities.

129.    Upon information and belief, a non-exclusive list of DEFENDANTS' violations of the

Rehabilitation Act and discriminatory conduct against PLAINTIFFS are evidenced by:

A.    denying PLAINTIFFS access to, and the opportunity to participate in or

benefit from, the aids, benefits, activities, programs, accommodations, and

services offered at the Property;

B.    by otherwise limiting PLAINTIFF in the enjoyment of the rights,

privileges, advantages, and opportunities enjoyed by individuals without

disabilities who receive DEFENDANTS' aids, benefits, and services at the

Property;

C.    making facility site or location selections that have the effect of

discriminating against individuals with disabilities, and excluding them from and denying them the benefits of, and defeating or substantially impairing the accomplishment of the objectives of, the services, programs, and activities offered by DEFENDANTS at the Property;

D.    failing to administer services, programs, and activities in the most integrated setting appropriate to the needs of PLAINTIFFS;

E.    excluding PLAINTIFFS from participation in, and the benefits of, DEFENDANTS' services, programs, and activities as a result of DEFENDANTS' Property being inaccessible to or unusable by PLAINTIFFS; and

F.    failing to design and/or construct new facilities, or make alterations to existing facilities, which are readily accessible to and useable by individuals with disabilities.

130.   Upon information and belief, there are additional, ongoing violations of the Rehabilitation Act at the Property which PLAINTIFFS are more likely than not going to encounter upon future visits to the Property. PLAINTIFFS bring this action:

A.    to redress injuries suffered as a result of DEFENDANTS' discriminatory actions and inactions, as set forth herein;

B.    to reasonably avoid further and future injury as a result of DEFENDANTS' ongoing failure to cease their discriminatory practices as set forth in this action, including correcting violations of the ADA and Rehabilitation Act;

28

C.     to ensure DEFENDANTS' Property is accessible as required by the relevant applications of Title II of the ADA;

D.     to be made whole and ensure future compliance; and

E.     to reasonably avoid future ADA and Rehabilitation Act litigation involving the same Property and under the same laws, as set forth herein, with its concomitant impact on otherwise scarce judicial resources.

131.   PLAINTIFFS demand that all mobility-related violations identified in the complete inspection by his expert be cured so as to ensure access for people with mobility-related disabilities, the primary purpose of this action.

132.   Upon information and belief, BOARD is the recipient of federal funds.

133.   UH promises to help its students with disabilities "achieve success at the University of Houston by providing you with access and accommodations with a goal for you to become successful graduates and engaged global citizens."[4]

134.   UH also "strives to be supportive of the academic, personal, and work-related needs of all of our community members and is committed to facilitating the full participation of faculty, staff, and students with disabilities in the life of the University."[5]

135.   The statements and promises above created an expectation interest that a UH student with disabilities would be able to fully participate in student life at UH and not encounter physical barriers that make it difficult/unsafe to use the program and activities at the

---

[4] *See* https://uh.edu/accessibility/about/new-name/ (last accessed December 6, 2022).
[5] *See* https://uh.edu/equal-opportunity/ada/ (last accessed December 6, 2022).

Property.

136.    When PLAINTIFFS enrolled at UH and began attending classes, they had an expectation that they would have a university experience free of disability discrimination. This expectation has not been realized due to the allegations of discrimination above.

137.    Accordingly, Plaintiffs are entitled to seek damages for their non-pecuniary losses associated with their expectation interest.

138.    Upon information and belief, as the recipient of federal funds, BOARD is liable for expectation interest damages and nominal damages to PLAINTIFFS as a result of its acts and omissions constituting intentional discrimination.[6] It is PLAINTIFFS' position that even an award of nominal damages in their favor would confer significant civil rights to the public, as a judgment of against BOARD, regardless of the amount, would likely deter DEFENDANTS from discriminating against individuals with disabilities in the future.

139.    As set forth above, PLAINTIFFS have been denied access to, and without the relief requested herein will continue to be denied the access to, the goods, services, programs, facilities, activities, and accommodations offered by DEFENDANTS, solely by reason of his disability, and has otherwise been discriminated against and damaged solely by reason of their disability, as a result of DEFEDANTS' Rehabilitation Act violations set forth above.

_____

[6] PLAINTIFFS do <u>not</u> seek monetary damages from KHATOR.

140.    PLAINTIFFS have been obligated to retain undersigned counsel for the filing and prosecution of this action.  PLAINTIFFS are entitled to recover reasonable attorneys' fees, costs, and litigation expenses from DEFENDANTS pursuant to 29 U.S.C. §794(b).

141.    Pursuant to 29 U.S.C. §794(a), this Court is provided authority to grant PLAINTIFFS injunctive relief, including an Order that DEFENDANTS alter the subject premises, facilities, services, activities, programs, and accommodations to make them accessible to and useable by individuals with disabilities to the extent required by the Rehabilitation Act.  This Court is also provided authority to grant PLAINTIFFS compensatory and nominal damages for BOARD's discriminatory actions.

## PRAYER FOR RELIEF

WHEREFORE, PLAINTIFFS pray that:

A.    This Court issue a Declaratory Judgment that determines that DEFENDANTS are in violation of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq*;

B.    This Court issue a Declaratory Judgment that determines that the Property, programs, and activities owned, operated, and administered by DEFENDANTS are in violation of the Rehabilitation Act;

C.    This Court grant preliminary and permanent injunctive relief against DEFENDANTS, including an Order to make the Property and the services, programs, and activities offered therein readily accessible to and usable by individuals with disabilities to the extent required by the ADA; to require DEFENDANTS to make reasonable modifications in policies,

31

practices, or procedures necessary to afford all offered goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities; and to require DEFENDANTS to take such steps that may be necessary to ensure that no individual with a disability is excluded, denied services, segregated, or otherwise treated differently from other individuals because of the absence of auxiliary aids and services;

D.      This Court enter an Order directing DEFENDANTS to alter and modify the Property and its facilities, services, activities, programs, and accommodations as appropriate to comply with the ADA and the Rehabilitation Act;

E.      This Court award PLAINTIFFS monetary damages (including nominal damages) pursuant to the Rehabilitation Act, for the harmed caused by BOARD's discrimination;

F.      This Court award PLAINTIFFS reasonable attorneys' fees, costs, and litigation expenses pursuant to 29 U.S.C. § 794a(a)2 and 42 U.S.C. § 12205 and 28 C.F.R. § 35.175; and

G.      Such other relief as the Court deems just and proper, and/or is allowable under Title II of the ADA and the Rehabilitation Act.

Respectfully submitted,

/S/ GARRET S. DEREUS

**BIZER & DEREUS, LLC**

GARRET S. DeREUS (Bar No. LA35105)
3319 St. Claude Ave.
New Orleans, LA 70117
T: 504-619-9999; F: 504-948-9996
Email: gdereus@bizerlaw.com
*Attorney in Charge*

***AND***

Martin J. Cirkiel
Attorney State Bar No.: 00783829
Federal ID No. 21488
CIRKIEL LAW GROUP, P.C.
f/k/a Cirkiel & Associates, P.C.
1901 E. Palm Valley Blvd.
Round Rock, Texas 78664
(512) 244-6658 [Telephone]
(512) 244-6744 [Direct Line]
(512) 244-6014 [Facsimile]
marty@cirkielaw.com
www.cirkielaw.com